NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

_____
:
:
:
:
ING LIFE INSURANCE AND ANNUITY    :
COMPANY, *et al.*                 :
: **Hon. Dennis M. Cavanaugh**
Plaintiff,   :
: **OPINION**
v.                                :
: Civ. No. 10-4076 (DMC) (JAD)
:
GITTERMAN, *et al.*               :
:
Defendants.  :
:
_____:

DENNIS M. CAVANAUGH, U.S.D.J.:

    This matter comes before the Court upon motion of ING Life Insurance and Annuity Company ("ILIAC") and ING Financial Advisors ("IFA") (collectively, "Plaintiffs" or "ING"). On August 10, 2010, Plaintiffs filed an Order to Show Cause, requesting that this Court enjoin Jeffrey Gitterman, Daniel Armas, Samuel Bell, Teri Castagneto-McLeish, Brian Donnelly, Marcy Gitterman, Tara Jakubik, David Katz, Ted Kowalchyn, Elias Rauch, Stan Sattler, Dennis Schlagel, Sarah Shipman and Lyn Tober (collectively, "Defendants" or "the Gitterman Group") from soliciting clients to withdraw certain accounts from ING, Defendants' former employer, pending the resolution of a FINRA Dispute Resolution Proceeding.

    On August 10, this Court entered an Order preliminary enjoining Defendants or any persons or entities acting in concert with them from (1) "soliciting, inducing or attempting to induce any

customers of Plaintiffs (or their affiliated companies) to sell or transfer assets from any ING Life Insurance and Annuity Company ("ILIAC") account, product or security" and (2) "taking any action designed to effectuate the sale or transfer of assets from any ILIAC account, product or security, including, but not limited to submitting or assisting others in submitting account withdrawal forms to ILIAC."  The Court ordered Plaintiffs to serve Defendants and to post a surety bond to pay the costs and damages sustained by any party found to have been wrongly enjoined or restrained.  The Court scheduled a hearing on Plaintiffs' application for August 17, 2010 at 11 am.

For the reasons stated below, in addition to those reasons stated on the record, Plaintiffs' motion for injunctive relief is **denied**, and the temporary restraints entered by this Court will be dissolved.

## BACKGROUND[1]

Jeffrey Gitterman and the Gitterman Group provide financial advice and planning services to New Jersey's college and university employees.  See Doc. No. 3, at 3.  In Spring 2000, the Gitterman Group became affiliated with Plaintiffs, and continued to provide advice regarding life and disability insurance, long term care planning, college savings plans for their children, and all aspects of their retirement, including 401(k)'s, and New Jersey ABP annuity accounts—which are the subject of this action.  Id. at 4.

During the period of Defendants' affiliation with ING, Defendants serviced ILIAC's account in New Jersey's Alternative Benefit Program ("ABP"), a defined contribution retirement program available to eligible employees of New Jersey's public institutions on higher education.  ABP provides retirement benefits, life insurance, and disability coverage to help provide income in

---

[1] The facts in the Background Section have been taken from the parties' submissions.

retirement. Doc. No. 1-2, at 4. Participants in the ABP contribute a portion of their salary, as determined by state law, plus a matching employer contribution, to a variable annuity issued by ILIAC known as the "Retirement Master" contract. Until Defendants' affiliation with ING terminated in May 2010, Defendants were responsible for servicing the accounts of more than 2,000 ILIAC customers with assets invested in the ABP.

Prior to April 2010, each Defendant was employed by ING either as an investment advisor, a career agent, a registered representative, or was employed in more than one of these capacities. Id. at 14. In February 2010, with ING's knowledge, the Gitterman team set up their own Registered Investment Advisory firm ("GAWM") and affiliated with an independent broker-dealer, Triad, as registered representatives. As a result, many of the clients now in issue established investment advisory and/or brokerage accounts with Defendants off of the ING platform. Id. at 14.

In May 2010, the affiliation between the Gitterman Group and ING was terminated, with an arrangement that would allow ING to maintain relationships with the Gitterman Group's clients with respect to these clients' investment in ING's New Jersey ABP. Id. With respect to every other aspect of the clients' portfolios, ING agreed to, and assisted in, facilitating their transfer from ING to the Gitterman Group's new broker dealer, Triad, and to GAWM (the Gitterman Group's new independently established Registered Investment Advisor), in order to allow these clients to maintain their various financial advisory relationships with the Gitterman Group. Id.

On May 4, 2010, in conjunction with the Gitterman representatives' new association with Triad, ILIAC and Triad entered into a limited selling agreement which authorized Gitterman representatives to continue servicing and soliciting New Jersey ABP clients. As noted above, the agreement between ING and Defendants permitted clients to maintain the relationship with ING

insofar as the Gitterman Group wished to continue to represent ING's Group Annuity contract in the New Jersey Alternative Benefit Plan under a limited selling broker agreement. Id. On or about May 26, Mr. Gitterman received an addendum to the limited selling agreement then already in effect. Id. at 6. The addendum contained, among other provisions, certain restrictive covenants prohibiting Defendants from soliciting ING ABP clients to new ABP plans. On June 30, Mr. Gitterman advised ING that Triad would not sign the addendum and asked ING to consider allowing the Gitterman Group to continue operating under the executed Limited Selling Agreement signed on May 4. ING refused and severed its relationship with the Gitterman Group. Id. at 6.

Although Defendants did not sign the restrictive covenants contained in the addendum, when Defendants first became affiliated with ING, they signed contracts with ILIAC and/or IFA that contained a non-solicitation clause. See Doc. No. 1-2, at 3. The contracts contained a provision providing that Defendants "shall not for a period of [one or] two years thereafter, directly or indirectly by or through any partner, associate, agent, employer, employee or firm action on the Agent's behalf: (i) advise, induce or attempt to induce any contract-holder of the Company [ILIAC] to cancel, replace or allow to lapse any annuity contract or security issued by the Company or its affiliates . . . " All of the Defendants signed covenants substantially similar to this provision.

## DISCUSSION

**A.    APPLICABLE LAW**

Injunctive relief is an "extraordinary remedy, which should be granted only in limited circumstances." Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co., 290 F.3d 578, 586 (3d Cir. 2002) (quotation and citation omitted).

To determine whether temporary restraints or a preliminary injunction is appropriate, a court

must consider (1) the likelihood of success on the merits of the underlying claim; (2) whether the movant will be irreparably injured if such relief is not granted; (3) the possibility of harm to other interested persons from the grant or denial of the injunction; and (4) whether the public interest will be served by the preliminary relief.  See Opticians Ass'n of Am. v. Ind. Opticians of Am., 920 F.2d 187, 191-92 (3d Cir. 1990).  The Court should issue injunctive relief "only if the plaintiff produces evidence sufficient to convince the district court that all four factors favor preliminary relief." AT&T Co. v. Winback & Conserve Program, Inc., 42 F.3d 1421, 1427 (3d Cir. 1994) (citation omitted); see The Nutrasweet Co. v. Vit-Mar Enters., Inc., 176 F.3d 151, 153 (3d Cir. 1999).

The Third Circuit "has placed particular weight on the probability of irreparable harm and the likelihood of success on the merits elements of the standard for preliminary injunction, stating that . . . we cannot sustain a preliminary injunction ordered by the district court where either or both of these prerequisites are absent.'" Scholastic Funding Group, LLC v. Kimble, 2007 U.S. Dist. LEXIS 30333, at *28 (D.N.J. Apr. 24, 2007).

**B.   ANALYSIS**

1. Likelihood of Success on the Merits

Plaintiffs assert that they are likely to prevail on the merits of their underlying claims for breach of the non-solicitation covenant.  Plaintiffs claims, then, are for breach of Defendants' employment contracts.

To "establish a breach of contract claim, a plaintiff has the burden to show that the parties entered into a valid contract, that the defendant failed to perform his obligations under the contract and that the plaintiff sustained damages as a result." Esquire Deposition Servs., LLC v. Boutot, 2009

U.S. Dist. LEXIS 52207, at *19-20 (D.N.J. June 19, 2009) (citing Murphy v. Implicito, 392 N.J. Super. 245, 920 A.2d 678, 689 (N.J. Super. Ct. App. Div. 2007)); H & R Block Eastern Tax Servs. v. Brooks, 2000 U.S. Dist. LEXIS 19369, at *7 (D. Ct. October 12, 2000).  A non-compete covenant will be "given effect if it is reasonable in view of all the circumstances of the particular case. It will generally be found to be reasonable where it simply protects the legitimate interests of the employer, imposes no undue hardship on the employee, and is not injurious to the public." Solari, 264 A.2d at 56.

      Defendants assert that they have not solicited Plaintiffs' clients, and therefore, are not in breach of the contracts (assuming a valid contract exists).  Although Defendants acknowledge that they have a continuing and ongoing relationship with the clients in question—as they providing financial planning, investment advisory/wealth management, and other retirement services to them—Defendants assert that they have not solicited clients to withdraw from Plaintiffs' ABP Annuity Plan.  Defendants emphasize, however, that they must necessarily, as fiduciaries, consider the whole of their clients' assets including the ABP accounts when rendering investment advice.  As such, they must discuss their clients' ING ABP accounts (which presumably will now be independently managed by a new ING representative).

      Plaintiffs respond that the evidence demonstrates that Defendants have solicited clients, relying on various communications with their clients. Through a declaration submitted to this Court, Plaintiffs assert that a number of clients were instructed by Defendants that they would have lower fees if they moved their assets from ING's financial product ABP Accounts), to a new, competing product.  In fact, Plaintiffs assert that a number of clients were directly asked by Defendants to move

as a result of the termination of the relationship between Plaintiffs and Defendants.[2]  Plaintiff also note that a move to a new non-ING ABP would permit Defendants to earn a commission, which they currently will not earn if the clients remain with ING.  Additionally, Plaintiffs argue that the shear number of withdrawal requests (over 200) in a short period of time indicate that a mass solicitation must have occurred.  With these facts in mind, Plaintiffs asserts that "[i]t strains credulity to suggest that these ILIAC customers, with no solicitation or encouragement from Defendants, all independently decided to withdraw their assets from ILIAC, just a few weeks after Defendants had lost their ability to receive commissions on the sale and servicing of ILIAC products."  Doc. No. 5, at 6.

This Court cannot agree that Plaintiffs have sufficiently demonstrated that there is a likelihood of success on the merits of their claims at this time.  Merely being in contact with former clients does not constitute solicitation.  See Mona Elec. Group, Inc. v. Truland Service Corp., 56 Fed.Appx. 108, 110 (4th Cir. 2003); Prudential Securities, Inc. v. Plunkett, 8 F. Supp. 2d 514, 520 (E.D. Va. 1998); Bayly, Martin & Fay, Inc. v. Pickard, 780 P.2d 1168, 1175 (Okl.. 1989); Aetna Bldg. Maintenance Co. v. West, 39 Cal. 2d 198 (1952).  This rule is of particular significance where, as here, there is no question that Defendants **must** be in contact with Plaintiffs' clients, as they provide financial advice to these clients on many non-ABP investments unrelated to ING's business interests.  The only evidence of solicitation Plaintiffs have provided is a single affidavit from an ING employee indicating that, through her communications with clients, it appears that Defendants' have recommended that Plaintiffs' clients switch to a different, competing ABP product.  Plaintiffs' declaration summarily refers to client communications, without indicating the number of such

---

[2] See Declaration of Nancy Gathers, signed August 8, 2010 ("Gathers Decl."), at ¶¶5-6.

communications or providing documentation of such communications.

The current evidence of record is insufficient to demonstrate that there is a substantial likelihood that Plaintiffs will succeed on their claims. See Cancer Genetics, Inc. v. Hartmayer, 2008 U.S. Dist. LEXIS 8260, at *10-12 (D.N.J. Feb. 4, 2008) (denying application for injunction, where that plaintiff did not present a witness with firsthand knowledge, and relied only upon a summary affidavit in support of injunction relief). Moreover, Defendants have provided the Court with a number of apparently unsolicited correspondences from clients indicating that they sought to remain with the Gitterman Group after the split from ING. While such evidence is anecdotal, it directly contradicts Plaintiffs' assertions and weighs in this Court's consideration as to whether Plaintiffs have met their heavy burden in establishing that injunctive relief is proper. See P.C. Yonkers, Inc. v. Celebrations the Party and Seasonal Superstore, LLC., 428 F.3d 504, 508 (3d Cir. 2005) ("The burden lies with the plaintiff to establish every element in its favor, or the grant of a preliminary injunction is inappropriate.").

Nor does this Court believe that the circumstantial evidence relied upon by Plaintiffs—namely, the withdrawal of many client accounts in a short time frame—necessarily indicates that they were solicited or encouraged to leave. For example, these clients may have determined, upon learning of the termination of the Gitterman-ING relationship, that they no longer wanted to remain with ING. A non-soliciting statement from the Gitterman Group or ING, then, could have triggered clients to defect, and they are entitled to do so.

In addition to finding that Plaintiffs have not met their burden of proof in demonstrating that injunctive relief is proper, the Court has questions about the scope of relief sought by Plaintiffs. In particular, the broad language requested by Plaintiffs restricts Defendants from "taking any action

designed to effectuate the sale or transfer of assets from any ILIAC account, product or security, including, but not limited to submitting or assisting others in submitting account withdrawal forms to ILIAC." This relief, the Court believes, may be overly broad, as it could prevent Defendants from taking certain actions on their clients' behalf, even if Defendants were not involved in soliciting these clients away from their ING ABPs.

2. Remaining Factors

In light of the Court's decision with respect to the likelihood of success on the merits, it will not consider the remaining factors relevant to issuance of injunctive relief.

### CONCLUSION

For the reasons stated herein, as well as those stated on the record on August 17, 2010, Plaintiffs' motion for injunctive relief is **denied**, and the Court will dissolve the temporary restraints entered on August 10, 2010.

                                          S/ Dennis M. Cavanaugh
                                          Dennis M. Cavanaugh, U.S.D.J.

Date:        August   18  , 2010
Original:   Clerk's Office
cc:         All Counsel of Record
            Hon. Joseph A. Dickson, U.S.M.J.
            File